UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

PRIORITY SEND

**CIVIL MINUTES -- GENERAL**

Case No. SACV 02-1184-JVS(ANx) Dated : December 21, 2004

Title: Ellison Educational Equipment, Inc. v. Jing Chen, etc., et al.

**PRESENT: HONORABLE JAMES V. SELNA, UNITED STATES DISTRICT JUDGE**

Karla J. Tunis — Courtroom Deputy
Not Present — Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFFS: Not Present

ATTORNEYS PRESENT FOR DEFENDANTS: Not Present

**PROCEEDINGS:** **Order Denying Plaintiff's Motion for Summary Judgment or in the Alternative, Summary Adjudication Against Quickutz Regarding Its Declaratory Relief Cause of Action (Filed 11/23/04)**

**Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment for Patent Inventorship and Breach of Nondisclosure Agreements (Filed 11/23/04)**

**Order Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment on Copyright and Trademark Liability (Filed 11/23/04)**

**Order Denying Intervenor Quickutz Inc's Motion for Summary Judgment on Its Complaint in Intervention (filed 11/23/04)**

**Order Denying Defendant Waitt/Freemont Machine, LLC's Motion for Partial Summary Judgment on Plaintiff's Fourth Claim for Relief (filed 11/23/04) Joinder by Intervenor Quickutz, Inc. (filed 11/23/04)**

**Order Granting in Part and Denying in Part Defendant Waitt/Freemont Machine, LLC's Motion for Partial Summary Judgment on Plaintiff's First Second, Third and Seventh Claims for Relief (filed 11/23/04)**

**Order Granting Joinder by Defendants Kelly Benes and David Benes (filed 11-23-04)**

DOCKETED ON CM
DEC 2 2 2004
BY 039

The parties in the instant case have filed the following motions for summary judgment: (1) Ellison Educational Equipment, Inc. ("Ellison")'s Motion for Summary Judgment for Patent Inventorship and Breach of Non-Disclosure Agreements; (2) Ellison's Motion for Summary Judgment on Copyright and Trademark Liability; (3) Ellison's Motion for Summary Judgment on Quickutz, Inc. ("Quickutz")'s Declaratory Relief Cause of

Action; (4) Quickutz's Motion for Summary Judgment on its Complaint In Intervention; (5) Waitt/Fremont Machine, LLC ("Waitt/Fremont")'s Motion for Summary Judgment on Ellison's First, Second, Third, and Seventh Claims for Relief; (6) and Waitt/Fremont's Motion for Summary Judgment on Ellison's Fourth Claim for Relief. The Court addresses each motion in turn in Section III, below.

1. <u>BACKGROUND</u>

Ellison was founded in 1977. The company manufactures and distributes silhouette designs of letters, numbers, and other various decorative shapes that are embodied in steel-rule dies[1] that can be used to cut the designs from paper and similar materials.

David and Kelly Benes (collectively, "the Beneses") began a company known as Fremont Machine & Tool, Inc. ("Fremont Machine") that created an idea for a new die-cutting machine. In late 1995 or early 1996, Fremont Machine approached Ellison and proposed that the two companies form a business relationship to bring Fremont Machine's new machine to market. The parties agreed to meet on June 4, 1997.

Before the June 4, 1997 meeting, both companies signed certain Nondisclosure Agreements and Confidential Disclosure Agreements in order to ensure that the information shared during the meeting remained confidential. At the meeting, the Beneses presented their idea for the new machine and Ellison engineers made some suggestions of how it could be improved. Ellison's suggestions were documented in a writing entitled "Memorialization of Meeting on Improvement Regarding Hand-Cranked Die Cutting Machine" that was signed by representatives of both companies.

In September 1997, the Beneses filed for a patent application for their new machine. This patent was issued on April 24, 2001 as U.S. Patent No. 6,220,136 (the "'136 Patent") and named David Benes, Kelly Benes, and David C. Mueller as the inventors. Although the patented machine allegedly incorporated many of the suggestions made by Ellison at the June 4, 1997 meeting, Ellison was not listed as a co-inventor.

In October 2001, Ellison filed an action against Jing Chen aka David Chen ("Chen") dba DCW Dies Co. ("DCW") for copyright infringement, false designation of origin, and unfair competition. The parties settled that action. As part of the settlement, Chen and DCW agreed to be bound by a Consent Judgment that enjoined Chen, DCW, and anyone

---

[1] A steel-rule die typically is a wooden rectangular base block into which razor blades are inserted and arranged to form a design. The razors are covered with a block of sponge rubber, which deforms downward when pressure is applied, exposing the cutting surface of the razor blades and cutting the design from whatever material is placed onto the die. (Compl., ¶ 14.)

with actual notice of the Consent Judgment who worked in concert with Chen or DCW from selling or distributing any products that contained shapes in which Ellison claims proprietary rights.

In early 2002, the Beneses entered into a partnership with Chen to create a venture known as CommCut International, LLC ("CommCut"). CommCut sold die designs that competed with Ellison's products. The instant action is a result of Ellison's belief that CommCut's designs infringed Ellison's proprietary rights in its products.

## 2. LEGAL STANDARD

Summary judgment will be granted if there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If, and only if, the moving party meets its burden, then the non-moving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. See id. at 322-23. If the non-moving party meets this burden, then the motion will be denied. Nissan, 210 F.3d at 1103. The Court will view the evidence in the light most favorable to the non-moving party, Thomas v. City of Beaverton, 379 F.3d 802, 807 (9th Cir. 2004); however, the Court may not assume the truth of the challenged allegations in the complaint. Butler v. San Diego Dist. Attorney's Office, 370 F.3d 956, 963 (9th Cir. 2004).

Where the parties have made cross-motions for summary judgment, the Court must consider each motion on its own merits. Fair Hous. Council v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001). The Court will consider each party's evidentiary showing, regardless of which motion the evidence was tendered under. See id. at 1137.

## 3. DISCUSSION

### 1. Quickutz's Complaint in Intervention and Ellison's Fourth Claim for Relief

In Ellison's Fourth Claim for Relief, it seeks a declaration that it is a co-inventor of the '136 Patent. Quickutz's Complaint in Intervention seeks a declaration that Ellison has no rights, title or interest in the '136 Patent. Ellison, Quickutz, and Waitt/Fremont and the Beneses have filed cross-motions for summary judgment on this claim.

#### 1. Co-Inventorship

The Court begins with a presumption that the named inventors of the '136 Patent–David Benes, Kelly Benes, and David C. Mueller–are the true and only inventors.[2]

---

[2]The patent subsequently was assigned to Waitt/Fremont.

Trovan, Ltd. v. Sokymat SA, Irori, 299 F.3d 1292, 1301 (Fed. Cir. 2002). Ellison, however, may overcome this presumption by clear and convincing corroborated evidence that it contributed to the conception of the invention. Id. at 1302. Conception is "the formation in the mind of the inventor[] of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice[]" and "is complete when one of ordinary skill in the art could construct the apparatus without unduly extensive research or experimentation." Id. Inventorship is determined on a claim-by-claim basis. Id. Therefore, the Court has compared Ellison's alleged contributions to the claim language of the '136 Patent.

It is undisputed that, at the conclusion of the parties' meeting on June 4, 1997, David Benes, David Hughes (Ellison's General Manager), and Kevin Corcoran (Ellison's Director of Product Development) signed a document entitled "Memorialization of Meeting on Improvement Regarding Hand-Cranked Die Cutting Machine" ("Memorialization"). That document lists eleven improvements to the Beneses' machine that Ellison allegedly proposed during the meeting. Ellison contends that Mr. Corcoran made a twelfth improvement, which was memorialized only as of March 21, 2002 in an email to Kim Fogarty, Ellison's in-house counsel. Of the twelve alleged suggested improvements, however, the parties agree that only two were incorporated into the '136 Patent: (1) the location and position of the machine's gear rack, and (2) the motorization of the machine. (See Waitt/Fremont's Mot. re Ellison's 4th Cause of Action, p. 13; Ellison's Opp'n to Waitt/Fremont's Mot. re 4th Cause of Action, p. 12 n.14; Quickutz's Mot. on its Complaint in Intervention, p. 17.)

At the June 4, 1997 meeting, Messrs. Corcoran and Hughes's allegedly suggested to the Beneses exactly how the machine's gear rack should be mounted. (See Ellison's Opp'n to Waitt/Fremont's Mot. re 4th Cause of Action, p. 14.) This suggestion, however, was omitted from the Memorialization. The only evidence to corroborate the suggestion is an email sent by Mr. Corcoran himself to Ms. Fogarty on March 21, 2002–nearly five years after the alleged suggestion was made. (Ellison's Mot. re Patent Inventorship & Breach of Nondisclosure Agreements, p. 16 & n.20.) This type of self-serving memorialization is not sufficient to meet the clear and convincing standard necessary to prove co-inventorship.

With respect to the second alleged contribution, Ellison contends that Messrs. Corcoran and Hughes discussed the motor's proper placement, power, size and torque, as well as how these items would effect the length of the legs on the machines. (Ellison's Mot. re Patent Inventorship & Breach of Nondisclosure Agreements, pp. 5-6.) Ellison contends that Messrs. Corcoran and Hughes further suggested how to implement necessary safety measures and how these improvements would affect the machine's cost. (Id.) Ellison puts forth two pieces of evidence to corroborate this suggestion: (1) the Memorialization, and (2) the Beneses' admissions and failure to refute Ellison's contributions. (Ellison's Mot. re Patent Inventorship and Breach of Nondisclosure Agreements, pp. 16-17.)

Claim 8 of the '136 Patent, which describes the motor, states:

> The material cutting device of claim 6 wherein said drive means comprises a motorized drive device including a high torque electric motor powered by an electrical power supply device, said electric motor having a drive shaft extending into a gear box having a series of reduction gears operative to slow the rotation output of said drive shaft and increase the torque output, one of said reduction gears being operatively connected to said at least one drive gear operative to engage said at least one toothed rack whereby engagement of said motorized drive device rotates said at least one drive gear thereby propelling said carriage along said base plate.

('136 Patent, col. 10, ll. 41-52.)

To corroborate its suggestion of the motor's proper placement, power, size and torque, Ellison relies heavily on the Memorialization. That document in relevant part merely states: "Make machine electric or automated." While this document corroborates the fact that the parties discussed the idea of adding a motor to the machine at the June 4th meeting, it does not corroborate the specific suggestions regarding the motor's power, size, and torque that Messrs. Corcoran and Hughes allegedly made.

Moreover, the fact that the Beneses "never refuted Ms. Fogarty's contention that Ellison had contributed to the machine they were trying to patent" (Ellison's Mot. re Patent Inventorship & Breach of Nondisclosure Agreements, p. 17) does not provide the "clear and convincing evidence" that Ellison is required to demonstrate to succeed in its claim of joint inventorship.

Even if the Court assumes that Ellison has met its Celotex burden, however, Quickutz, Waitt/Fremont and the Beneses have come forward with evidence to create a genuine issue of fact as to whether Ellison's employees "merely assisted with the implementation of the completed invention after its conception." (Waitt/Fremont's Mot. re Ellison's 4th Cause of Action, p. 7.) Specifically, Quickutz, Waitt/Fremont and the Beneses cite the deposition testimony of David Benes, Kelly Benes, and David Mueller to support its assertion that conception was complete as before the June 4, 1997 meeting. (Waitt/Fremont's Mot. re Ellison's 4th Cause of Action, p. 7.) While the cited testimony does not conclusively establish that conception of the machine with a motor was complete, the Court finds that it is sufficient to create a triable issue. (See D. Benes Depo. 56:23-58:2; K. Benes Depo. 102:9-111:; Mueller Depo. 260:5-261:22, 274:20-276:3)

Therefore, the Court finds that a triable issue remains as to whether Ellison

contributed sufficiently to the '136 Patent's conception so as to become a joint inventor. The Court cannot say as a matter of law that Ellison's evidence is "clear and convincing."

2. Assignment of Rights

Quickutz, Waitt/Fremont, and the Beneses contend that Ellison assigned any rights that it had in the '136 Patent by virtue of its execution of a Confidential Disclosure Agreement ("CDA"). (Quickutz's Mot. re its Complaint in Intervention, pp. 21-23; Waitt/Fremont's Mot. re. Ellison's Fourth Claim for Relief, pp. 17-19.) The CDA states in relevant part that:

> Ellison will assign to [Fremont Machine] all rights in and to any inventions, whether patentable or not, which occur as a result of work by Ellison in the further development of the new product, provided that such invention is covered by one or more claims of a U.S. patent granted to [Fremont Machine] for said new product . . . .

Ellison argues that the CDA is nothing more than an "agreement to assign" certain rights of Ellison in the future. (Ellison's Mot. re Patent Inventorship & Breach of Nondisclosure Agreements, p. 18.) The Court agrees. The Federal Circuit has made clear that the words "will assign" do not "rise to level of a present assignment." Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1580 (Fed. Cir. 1991).

Arachnid concerned a dispute over the rights to a patent following a consulting agreement that provided: "any inventions conceived by IDEA or its employees . . . in the course of the project covered by this agreement, shall be the property of CLIENT [Arachnid], and all rights thereto will be assigned by IDEA . . . to CLIENT." Id. at 1576 (emphasis in original). The court in that case rejected Arachnid's claim that the consulting agreement automatically divested IDEA of their "rights to inventions that might be developed under the agreement or patents to issue thereon." Id. at 1580. Instead, the court held that the provision in the consulting agreement that all rights "will be assigned" was merely "an agreement to assign, not an assignment." Id. at 1580-81 (emphasis in original). This holding has been affirmed by the Federal Circuit in other cases where similar language has been used. See, e.g., Gaia Techs., Inc. v. Reconversion Techs., Inc., 93 F.3d 774, 779 (Fed. Cir. 1996); cf. Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1253 (Fed. Cir. 2000). Here, the CDA clearly states that Ellison "will assign" certain rights in the future. This merely is an agreement to assign, not an assignment.

Moreover, the Court agrees with Ellison that the CDA only contemplates the assignment of rights that occur as a result of the further development of the machine. By its terms, the CDA is effective as of the last date it was signed. Since both Ellison and Fremont

Machine signed the agreement after June 4, 1997,[3] it follows that the CDA cannot assign Ellison's rights, if any, that were acquired during the June 4th meeting.

The Court thus finds that there is no genuine issue that Ellison did not assign any rights it had in the '136 Patent by virtue of the CDA. Accordingly, summary judgment on this issue is granted in favor of Ellison.

3. Equitable Estoppel

Quickutz, Waitt/Fremont, and the Beneses rely on MCV, Inc. v. King-Seeley Thermos Co., 870 F.2d 1568 (Fed. Cir. 1989) to argue that Ellison is equitably estopped from asserting a right to co-inventorship because it waited more than four years to assert its claim. (Waitt/Fremont's Mot. re Ellison's Fourth Claim for Relief, pp. 15-16; Quickutz's Mot. re its Complaint in Intervention, pp. 19-20.) Ellison, on the other hand, argues that MCV was overruled by A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020 (Fed. Cir. 1992) (en banc).

MCV set forth the following four elements to prevail on a claim of equitable estoppel: "(1) unreasonable and inexcusable delay in filing suit, (2) prejudice to the defendant as a result of the delay, (3) affirmative conduct by the party against whom estoppel is asserted inducing the belief that it had abandoned its claim, and (4) detrimental reliance by the party asserting estoppel." MCV, 870 F.2d at 1571.

Aukerman, however, held that this test "confusingly intertwines the elements of laches and equitable estoppel and is expressly overruled." Aukerman, 960 F.2d at 1042. Instead, the court held that the following three elements must be met: (1) the plaintiff, through misleading conduct (including silence where there was an obligation to speak), leads the defendant to reasonably infer that it does not intend to enforce its patent against the defendant; (2) the defendant relies on that conduct; and (3) due to its reliance, the defendant will be materially prejudiced if the plaintiff is allowed to proceed with its claim. Id. at 1028. Quickutz, Waitt/Fremont, and the Beneses, however, argue that Aukerman involved a claim for infringement and thus "in no way affects the validity of [MCV] as precedent in this case." [Quickutz & Waitt/Fremonts' Reply to Ellison's Opp'n re Complaint in Intervention, p. 10.] The Court disagrees and adopts the test for equitable estoppel as established in Aukerman to the facts of this case.

Quickutz, Waitt/Fremont, and the Beneses have not, and cannot, contend that Ellison

[3] Lisa Corcoran signed the CDA on behalf of Ellison on July 9, 1997; David Benes signed on behalf of Fremont Machine on June 28, 1997.

ever affirmatively represented that it would not enforce a claim of co-inventorship.[4] Rather, Quickutz, Waitt/Fremont, and the Beneses argue that Ellison said nothing, and that Ellison's silence caused Fremont Machine to make "substantial investments" in the prosecution of the '136 Patent, as well as in the development and marketing of the machine. (Waitt/Fremont's Mot. re Ellison's Fourth Claim for Relief, p. 16; Quickutz's Mem. re its Complaint in Intervention, p. 20.)

Auckerman is clear that "silence alone will not create an estoppel unless there was a clear duty to speak . . . ." Aukerman, 960 F.2d at 1043. Here, Quickutz, Waitt/Fremont, and the Beneses have not alleged any such duty. More importantly, the Court believes that the equitable estoppel claim is based solely on inferences made by Quickutz, Waitt/Fremont, and the Beneses as a result of Ellison's delay in bringing its claim. Unreasonable delay and resulting prejudice, however, are not elements of estoppel. Id. Therefore, summary judgment is granted in favor of Ellison on this claim.

4. Breach of Nondisclosure Agreements

Ellison contends that the Beneses breached the nondisclosure agreements signed on January 22, 1996 and June 4, 1997. (Ellison's Mot. re Patent Inventorship & Breach of Nondisclosure Agreements, p. 19.) The only evidence Ellison offers to support this claim is that the Beneses allegedly incorporated confidential contributions of Messrs. Corcoran and Hughes into the '136 Patent. (Id. at pp. 19-20.) As explained above, however, the Court finds that a triable issue remains as to whether these suggestions were incorporated into the patent. Therefore, summary judgment on this related issue is denied.

5. Conclusion

For the foregoing reasons, the Court denies the parties' cross-motions for summary judgment on the issue of co-inventorship. Moreover, the Court grants summary judgment in favor of Ellison on the issues of assignment of rights and equitable estoppel. Finally, the Court denies summary judgment on the issue of whether the Beneses breached the nondisclosure agreements.

2. Ellison's Motion for Summary Judgment on Copyright and Trademark Liability

1. Copyright

Ellison's copyright claim is based upon the observations of its employees while at a trade show in Anaheim, California in January 2002. Ellison alleges that at that trade show, it

---

[4]The 1997 Jacobs memo speaks only of infringement, not ownership. (Donsbach Decl., Ex. 50.)

discovered that defendant CommCut International, LLC ("CommCut") was selling a die-cutting machine and dies that were identical or nearly identical to Ellison's die designs. (Ellison's Mot. re Copyright & Trademark Liability, p. 4.) CommCut was an informal joint venture formed between Chen, D/B/A DCW Dies, and the Beneses.[5]

As an initial matter, the Court addresses CommCut's two arguments why Ellison's designs are unprotected by copyright. First, CommCut argues that "Certainly, Ellison can lay no viable copyright claim to the *ideas* of a person diving, jungle leaves, Greek ruins, crowns, candy suckers, oranges or banners. Each of these subjects are clearly within the public domain." (Opp'n to Ellison's Mot. re Copyright & Trademark Liability, p. 6) (emphasis in original.) CommCut's argument is misplaced. While it is true that ideas are unprotected by copyright law, creative expression of those ideas does receive protection. Rice v. Fox Broad. Co., 330 F.3d 1170, 1174 (9th Cir. 2003). Thus, for example, the idea of a person diving is not protected, but the particular expression of that idea is. Ellison's claims of copyright infringement allege that CommCut copied its specific designs, not merely the idea to use the designs.

Second, CommCut argues that Ellison's designs "each constitute expression which is not subject to copyright protection." (Opp'n to Ellison's Mot. re Copyright & Trademark Liability, p. 6.) For example, CommCut contends that "Ellison is not permitted to prevent its competitors from marketing dies which depict a person diving merely because the allegedly infringing die depicts a person in a standard diving pose." (Id. at 7.) Again, CommCut's argument is unavailing. It is true that Ellison cannot claim copyright infringement merely because a die depicts a person in a standard diving pose, but that is not what Ellison alleges. Rather, Ellison has alleged and must prove that CommCut has copied its particular designs.[6]

To succeed in its copyright infringement claim, Ellison must demonstrate (1) that it owns the copyright to the allegedly infringed works, and (2) that CommCut copied protected elements of those works. Swirsky v. Carey, 376 F.3d 841, 844 (9th Cir. 2004). Ellison's copyright registration for its die designs creates a presumption of ownership. 17 U.S.C. § 410(c); Micro Star v. Formgen, Inc., 154 F.3d 1107, 1110 (9th Cir. 1998). The Beneses do not dispute Ellison's ownership of its designs, and the Court is satisfied that this element is met. The Court's inquiry, therefore, is limited to whether CommCut copied protected elements of Ellison's designs.

Copying is proven by demonstrating (1) that the defendant had access to the protected

---

[5]For purposes of this motion, the Court uses "CommCut" and "the Beneses" interchangeably.

[6]As is clear from the differences in the parties' own designs, there is not a single way to depict a diver.

work, and (2) that the defendant's designs are substantially similar to the protected elements in plaintiff's work. Swirsky, 376 F.3d at 844. Where there is a high degree of access, the plaintiff's burden of demonstrating a substantial similarity between the works is lowered. Id.

1. Access

It is undisputed that Ellison has been in operation since 1977 and actively has marketed its designs since that time. Moreover, the Beneses concede that they received copies of Ellison's catalogs and had seen its designs at trade shows and on the internet. (K. Benes Depo. at 212:1-20; D. Benes Depo. at 109:24-110:4.) The Court is thus satisfied that the Beneses had a high degree of access; Ellison's burden of proof of substantial similarity consequently is lowered commensurately. Swirsky, 376 F.3d at 844-45.

2. Substantial Similarity

In determining whether works are substantially similar, the Court must apply both an intrinsic and extrinsic test. The former is a subjective test that "focuses on whether the ordinary, reasonable audience would recognize the defendant's work as a 'dramatization' or 'picturization' of plaintiff's work" Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994) (internal quotations omitted); whereas the latter is an objective test that focuses on articulable similarities between the two works. Id.

Ellison alleges that CommCut infringed the following seven die designs: Diver (VA 746-276), Jungle Leaves (VA 680-763), Greek Ruins (VA 736-696), Crown # 1 (VA 561-688), Candy Sucker (VA 717-950), Orange (VA 347-765), and Banner # 1 (VA 695-663). (Ellison's Mot. re Copyright & Trademark Liability, pp. 10-12.) The Court addresses each design in turn.

1. Diver

Ellison has identified the following objectively similar features between its design and CommCut's design: (1) both designs depict the diver's feet together; (2) both divers' arms are separated; and (3) the divers' profiles, body proportions, and orientation of the arms are "strikingly similar." (Ellison's Mot. re Copyright & Trademark Liability, p. 10.) The Beneses, however, point to the following differences: (1) the length of the divers' hair is different; and (2) Ellison's diver is a male, whereas CommCut's diver is a female. (Opp'n to Ellison's Mot. re Copyright & Trademark Liability, p. 3-4.)

The Court agrees that CommCut's diver clearly is female, whereas Ellison's diver appears to be male. Moreover, the Court notes that CommCut's figure is more curvaceous than Ellison's. As a result of these differences, the Court finds that a genuine issue exists as to whether Ellison can satisfy the extrinsic test. Accordingly, summary judgment for

infringement of this design is denied.

2. Jungle Leaves

Ellison directs the Court to the following similarities between its "Jungle Leaves" design and CommCut's allegedly infringing design: (1) both contain silhouettes of two leaves, one large and one small, both bending towards each other; (2) the proportions of each are nearly identical; and (3) the location and size of the segments on each leaf are very similar. (Ellison's Mot. re Copyright & Trademark Liability, p. 10.) The Beneses, on the other hand, point to the following differences: (1) the shapes and curvatures of CommCut's leaves are different than Ellison's; (2) CommCut's leaves are larger and have more "cuts" within them; and (3) Ellison's leaves have a series of dots down the stem line throughout the body of the leave, which are not included in CommCut's design. (Opp'n to Ellison's Mot. re Copyright & Trademark Liability, p. 4.)

Despite the differences identified by the Beneses, the Court finds that Ellison has satisfied the extrinsic test because the designs are objectively similar. The Court notes that the infringing work does not have to be identical to the plaintiff's, as long as "they share a similarity of ideas and expression as measured by external, objective criteria." Swirsky, 376 F.3d at 845 (emphasis added.) Given the myriad of possible ways to depict jungle leaves, the Court finds no genuine issue that CommCut's design is objectively similar to Ellison's.

Moreover, the Court finds that the intrinsic test is satisfied because Ellison has demonstrated a lack of triable issue that, viewed subjectively, a reasonable person would believe that the "total concept and feel" of the two works are substantially similar. Berkic v. Crichton, 761 F.2d 1289, 1292 (9th Cir. 1985); See 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12.10[B][3]. The Beneses, however, have failed to meet their Celotex burden of creating a triable issue. The Court thus grants summary judgment in favor of Ellison as to the "Jungle Leaves" design because reasonable minds could not differ on the issue of substantial similarity. Shaw v. Lindheim, 919 F.2d 1353, 1555 (9th Cir. 1990).

3. Greek Ruins

The following similarities have been identified by Ellison between its design and CommCut's: (1) both have exactly eight columns; (2) both have two levels rising up to the main level; and (3) the pediments at the top of both designs haev a complete angle on the left side and a damages angle on the right side. (Ellison's Mot. re Copyright & Trademark Liability, p. 11.) CommCut, however, points to the following differences: (1) Ellison's design has a flatter roofline; (2) the portions of Ellison's roofline that are broken are different than CommCut's; (3) the steps leading up to the structure are different. (Opp'n to Ellison's Mot. re Copyright & Trademark Liability, p. 4.)

The Court finds that the differences in the roofs and steps of the designs are sufficient to create a triable issue as to whether Ellison can satisfy the extrinsic test. Accordingly, summary judgment for infringement of this design is denied.

4. Crown

The following similarities exist in the parties' crown designs: (1) both have five points; (2) the middle point of each crown is the highest peak; (3) the second and fourth points of each crown have rounded ball ends; and (4) both have a diamond shape beneath the center point. (Ellison's Mot. re Copyright & Trademark Liability, p. 11.) The following differences, however, also are present: (1) CommCut's design has rounded ball ends on the first and fifth points; and (2) CommCut's design includes more detail within the body of the crown than Ellison's design. (Opp'n to Ellison's Mot. re Copyright & Trademark Liability, p. 4.)

As with the previous design, the Court finds that the differences in CommCut's design are sufficient to create a triable issue as to whether Ellison can satisfy the extrinsic test. Accordingly, summary judgment for infringement of this design is denied.

5. Candy Sucker

Ellison argues that CommCut's candy sucker design infringes its design because both "consist of a rounded shape on a stick with an umbrella like shape under the rounded portion." (Ellison's Mot. re Copyright & Trademark Liability, p. 11.) CommCut, however, points to the following differences: (1) CommCut's design leans to the left, whereas Ellison's leans to the right; (2) the details on the wrapper are different; and (3) the base of the wrapper in CommCut's design has a more rounded appearance than does Ellison's design. (Opp'n to Ellison's Mot. re Copyright & Trademark Liability, p. 4.)

While the objective differences between the two designs are slight, the Court must be careful to "distinguish between the protectable and unprotectable material because [Ellison] may place no reliance upon any similarity in expression resulting from unprotectable elements." Rice, 330 F.3d at 1174 (internal quotation marks omitted). Under the *scenes a faire* doctrine, no protection is given to certain commonplace expressions that are "indispensable and naturally associated with the treatment of a given idea." Swirsky, 376 F.3d at 850.

Here, Ellison chose to create a design of a candy sucker. No protection is given to the stick element of Ellison's design because sticks are "indispensable and naturally associated" with candy suckers. Although suckers generally are round (which cuts against copyright protection), they also may be square or larger and disc-shaped. The creative decision to create a round sucker therefore is protected. The only remaining element of the design–the

wrapper–also is protected because of the creative decisions regarding the shape and design contained on the wrapper.

Of the three protected elements of Ellison's design (the round shape of the sucker, the design on the wrapper, and the shape of the wrapper), two are objectively different in CommCut's design (e.g., the shape of the wrapper and the design on the wrapper). The Court thus finds that a triable issue exists as to whether Ellison can satisfy the extrinsic test. Accordingly, summary judgment for infringement of this design is denied.

6. Orange

Ellison identifies the following similarities between its "Orange" design and CommCut's: (1) both are identical in proportion and placement of the leaf; and (2) the curves of the stems are identical. (Ellison's Mot. re Copyright and Trademark Liability, p. 11.) CommCut, however, argues that the leafs and stems of the designs differ. (Opp'n to Ellison's Mot. re Copyright & Trademark Liability, pp. 4-5.)

The Court finds that an orange, depicted as a round ball with a stem and leaf, is exactly the type of expression to which the *scenes a faire* doctrine applies. There is nothing unique or creative in Ellison's design. Indeed, the only way to depict an orange is to do exactly what they have done. Even the stem and leaf are necessary because without them a person would not realize that the design is a fruit, as opposed to an orange ball. Since there is nothing unique in Ellison's design, it receives no copyright protection and CommCut cannot be liable for copying it. Therefore, summary judgment is granted in favor of CommCut with respect to infringement of the "orange" design.

7. Banner

Ellison attempts to prove substantial similarity between its "banner" design and CommCut's by arguing that both "are identical in the number of folds at either end" and "both have 'v' shaped ends." (Ellison's Mot. re Copyright & Trademark Liability, p. 12.) CommCut, however, identifies the following differences: (1) Ellison's banner is curved, whereas CommCut's banner is more rectangular; and (2) the end of CommCut's banner has longer "tails" than does Ellison's design. (Opp'n to Ellison's Mot. re Copyright & Trademark Liability, p. 5.)

Based on the objective differences in the designs, the Court finds that a triable issue exists as to whether Ellison can satisfy the extrinsic test. Accordingly, summary judgment for infringement of this design is denied.

3. Conclusion

For the foregoing reasons, summary judgment is granted in favor of Ellison for infringement of the "Jungle Leaves" design, and in favor of CommCut and the Beneses for the "Orange" design. Summary judgment is denied with respect to the remaining designs.

2. Trademark / Trade Dress

Ellison alleges that it owns valid trademark rights in the font name "Lollipop" and that it owns protectable trade dress rights in its die-cut designs.[7] These rights allegedly have been infringed by CommCut, which used the identical "Lollipop"font name and similar die-cut designs.

The Court begins its analysis by noting that Ellison has not alleged that it has registered the "Lollipop" mark. As such, its remedies for trademark infringement are limited to those provided under § 43(a) of the Lanham Act. See Brookfield Commumications, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1046 n.6 (9th Cir. 1999). The analysis for an unregistered trademark under § 43(a) and for trade dress is "very similar." Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 823 (9th Cir. 1993). Under either theory, Ellison must demonstrate that the "Lollipop" trademark, as well as the die-cut designs: "(1) [are] nonfunctional; (2) [are] either inherently distinctive or has acquired secondary meaning; and (3) [are] likely to be confused with [CommCut's] products by members of the consuming public." Id.; Disc Golf Ass'n v. Champion Discs, 1002, 1005 (9th Cir. 1998).

1. Lollipop Font Name

The first element is satisfied because Ellison could have chosen any name to describe the font without losing the font's intended function. Therefore, the font name "Lollipop" is nonfunctional. Playboy Enters. v. Netscape Communs. Corp., 354 F.3d 1020, 1031-32. With respect to the second element, Ellison cannot claim that the mark "Lollipop" is inherently distinctive because it does not identify "the particular source of the product or distinguish[] it from other products." Int'l Jensen, 4 F.3d at 824. Indeed, the mark "Lollipop" is more likely to be associated with a candy manufacturer than a die-cutting manufacturer. The mark may, however, have acquired a secondary meaning.

A secondary meaning is acquired "when the purchasing public associates the mark or dress with a single producer or source rather than with the product itself." Id. Thus, the issue is whether die-cutting consumers associate the "Lollipop" mark with Ellison. Proof of intentional copying by an alleged infringer, however, strongly supports an inference of

---

[7]Specifically, Ellison alleges the following designs are protected: Banner # 1, Schoolhouse # 1, Railroad Track # 1, Railroad Track # 2, Candy Sucker, Diver, Crown # 1, Orange, Dolphin, Greek Ruins, and Jungle Leaves. (Ellison's Mot. re Copyright & Trademark Liability, p. 17.)

secondary meaning. Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989). Here, it is clear that CommCut copied Ellison's mark and created a competing font named "lollipop." The Beneses have not come forward with any evidence, or even argued, that the selection of the font's name was purely coincidental. Accordingly, the second element has been satisfied.

Finally, Ellison must demonstrate that CommCut's use of the "lollipop" mark is likely to confuse consumers. The Court considers eight factors in making this determination: (1) the strength of the plaintiff's mark; (2) similarity of the marks; (3) proximity of the goods in question; (4) evidence of actual confusion; (5) marketing channels used by both parties; (6) types of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the parties' product lines. AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).

1. Strength of the Mark

"The strength of a mark is determined by its placement on a continuum of marks." Entrepreneur Media v. Smith, 279 F.3d 1135, 1141 (9th Cir. 2003) (quoting E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992)). Ellison contends that "Lollipop" is an arbitrary mark because it does not describe or suggest the nature or quality of Ellison's font die-cut. (Ellison's Mot. re Copyright & Trademark Liability, p. 14.) The Court agrees. "Lollipop" is a common word that is "non-descriptive of any quality of the goods or services." Smith, 279 F.3d at 1141. Arbitrary marks are strong and are given maximum trademark protection. Id.

Placement of the mark on the continuum, however, is only the first step; the Court must also determine the strength of the mark in the marketplace. Miss World (UK), Ltd. v. Mrs. America Pageants, Inc., 856 F.2d 1445, 1449 (9th Cir. 1988). To this end, the Court applies both the "imagination test" and the "need test." Under the former, the Court asks "how much imagination a consumer must use to associate a given mark with the goods or services it identifies." Id. Under the "need test," however, the Court "asks to what extent a mark is actually needed by competitors to identify their goods or services." Id. Although Ellison has not provided any evidence regarding these tests, the Court finds that the imagination aspect is high. As opposed to "bold" or "italics," the word "lollipop" does not describe the font; rather, it takes imagination to associate the two. Moreover, the need aspect is low because competitors such as CommCut do not need to use the word "lollipop" to describe their products. Thus, this factor weighs in favor of Ellison.

2. Similarity of the Marks

CommCut's mark is identical to Ellison's. This factor thus weighs in favor of Ellison.

3. Proximity of the Goods in Question

The inquiry under this factor is whether the public will mistakenly assume that there is an association between Ellison's and CommCut's goods, even though no association exists. Sleekcraft, 599 F.2d at 350. Here, identical marks were used to sell competing products to the same consumers. This factor weighs in favor of Ellison.

4. Evidence of Actual Confusion

Ellison has not produced any evidence of actual confusion. Since this is difficult to do, however, a lack of evidence in this factor is not dispositive. Id. at 353.

5. Marketing Channels Used by Both Parties

Here, both parties marketed their products through catalogs, the internet, and trade shows. (Ellison's Mot. re Copyright & Trademark Liability, p. 14.) This factor weighs in favor of Ellison.

6. Types of Goods and the Degree of Care Likely to be Exercised by the Purchaser

Ellison argues that its primary consumers are educators who "often make decisions regarding purchase of die designs rather quickly given the time constraint they are under . . . ." (Ellison's Mot. re Copyright & Trademark Liability, p. 16.) The Court is unpersuaded that educators are under any more time constraints than other consumers. Therefore, resolving inferences in favor of the non-moving party, this factor weighs in favor of CommCut.

7. Defendant's Intent in Selecting the Mark

It is undisputed that the Beneses were aware of Ellison's products when they adopted the infringing mark for their product. (K. Benes Depo. at 212:1-11; D. Benes Depo. at 110:1-4.) This factor thus weighs in favor of Ellison.

8. Likelihood of Expansion of the Parties' Product Lines

Given that CommCut was a relatively new company at the time it used the "lollipop" mark, there is a high probability that it would expand its product line and compete directly with Ellison. Therefore, this factor weighs in favor of Ellison. See Sleekcraft, 599 F.2d at 354.

9. Conclusion

On balance, the Sleekcraft factors weigh in favor of Ellison. The Court thus finds that no genuine issue exists that CommCut and the Beneses infringed Ellison's "Lollipop" trademark.

2. Die-Cut Designs

As noted above, Ellison alleges that CommCut infringed its trade dress in its die-cut designs ("designs"). Since the test for infringement of an unregistered trademark and a trade dress are the same, the Court repeats the test for Ellison's designs.

The first element, nonfunctionality, is satisfied because the designs themselves are purely aesthetic and thus cannot be functional. Clicks Billiards, Inc. v. Sixshooters Inc., 251 F.3d 1252, 1260 (9th Cir. 2001). As to the second factor, Ellison argues that there is "no question" that its designs have acquired a secondary meaning as a result of "many years of continuous and exclusive use in the die-cut industry, millions of dollars spent on advertising and marketing, hundreds of thousands of unit sales, and widespread recognition in the trade and among consumers." (Ellison's Mot. re Copyright & Trademark Liability, p. 17) (citing Corcoran Decl. at ¶¶ 7, 9-18.) Since "[e]vidence of use and advertising over a substantial period of time is enough to establish secondary meaning," Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 517 (9th Cir. 1989), the Court finds that Ellison has satisfied the second element.

Finally, Ellison must demonstrate a likelihood of confusion. The first Sleekcraft factor–the strength of the mark–is questionable. Ellison has not provided the Court with any evidence of the inherent distinctiveness of the designs. The Court, however, notes that this factor is of diminished importance in the instant case because the appearance of the infringing designs are almost identical. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1208 (9th Cir. 2000); Brookfield Communs., Inc. v. West Coast Ent'm Corp., 174 F.3d 1036, 1058-59 (9th Cir. 1999).

The remaining Sleekcraft factors weigh in favor of Ellison: CommCut's designs are nearly identical to Ellison's, they were marketed to the same class of consumers through the same channels, and CommCut was aware of Ellison's designs when it created its own designs. (Ellison's Mot. re Copyright & Trademark Liability, p. 18.) The Court thus finds that Ellison has met its Celotex burden by demonstrating a lack of genuine issue as to whether CommCut's designs infringed Ellison's trade dress. CommCut, however, has not put forward any evidence to create a triable issue. Therefore, summary judgment on the issue of trade dress infringement is granted in favor of Ellison.

3. Willful Infringement

Ellison argues that the infringement of its copyrights, trademark, and trade dress was willful. (Ellison's Mot. re Copyright & Trademark Liability, p. 19.) To establish willful infringement, Ellison must demonstrate that the Beneses acted with knowledge that their conduct constituted infringement. Peer Int'l Corp. v. Pausa Records, Inc., 909 F.2d 1332, 1336 n.3 (9th Cir. 1990); See Gracie v. Gracie, 217 F.3d 1060, 1068-69 (9th Cir. 2000).

Ellison contends that the Beneses acted willfully because they were aware of the Consent Judgment entered against Chen when they went into business with him. (Ellison's Mot. re Copyright & Trademark Liability, p. 19.) Accordingly, Ellison argues, the Beneses were aware that Ellison claimed proprietary rights in the design of its designs and that Chen had previously infringed those rights. (Id.)

The Court finds that Ellison has not met its Celotex burden because even if the Beneses knew of Chen's prior infringement, Ellison has not demonstrated that the Beneses knew that CommCut's designs infringed Ellison's designs. Indeed, Kelly Benes testified at her deposition that she "had conversations with Jing Chen about us wanting to make sure that our dies were different from everyone else's." (K. Benes Depo. at 253:25-254:2.) Accordingly, summary judgment on the issue of willful infringement is denied.[8]

4. Contempt of the Consent Judgment

Finally, Ellison asks this Court to find that the Beneses are in contempt of the Consent Judgment that enjoins Chen "and all his agents, servants, employees, attorneys and those working in active concert or participation with him who receive notice of this injunction, by personal service or any other form of actual notice" from infringing Ellison's copyrighted or trademarked designs. (Ellison's Mot. re Copyright & Trademark Liability, pp. 24-25.)

As an initial matter, the Court questions whether it has the authority to conduct contempt proceedings with regard to another court's decree, and Ellison offers no case law or statutory support for its demand. In any event, the only evidence that Ellison offers to support its argument is David Benes' deposition testimony that he and Kelly Benes were aware of some prior litigation between Chen and Ellison. (Id. at p. 25.) From this testimony, however, Ellison at best may argue that the Beneses were put on constructive notice of the Consent Judgment because there is no proof that they actually knew of the

---

[8]At oral argument, counsel for the Beneses requested that the Court enter summary judgment on their behalf. Although the Court has the authority to enter summary on behalf of the non-moving party, Cool Fuel, Inc. v. Connett, 685 F.2d 309, 311 (9th Cir. 1982), it is not satisfied that the issue has been sufficiently ventilated through the instant motions. See id. The Court thus denies the Beneses' request.

injunction. By the terms of the injunction, actual notice is required to bind third parties. Ellison thus has not met its Celotex burden and summary judgment on this issue is denied.

5. Conclusion

For the foregoing reasons, the Court grants summary judgment in favor of Ellison for trademark and trade dress infringement, as well as for copyright infringement of its "Jungle Leaves" design.[9]

Summary judgment is entered in favor of the Beneses and CommCut for copyright infringement of Ellison's "Orange" design. Summary judgment is denied with regard to Ellison's remaining copyright infringement claims, its claim of willful infringement, and its claim for contempt of the Consent Judgment.

3. Waitt/Fremont's Motion for Summary Judgment on Ellison's Copyright and Trademark Claims

Waitt/Fremont moves for summary judgment on Ellison's copyright and trademark claims because it alleges that it was not involved with any of the infringing activity. Ellison does not allege in the complaint that Waitt/Fremont directly infringed its die designs; rather, Ellison seeks to impose liability on Waitt/Fremont through the doctrine of vicarious infringement.

1. Copyright

To prevail in its vicarious copyright infringement claim against Waitt/Fremont, Ellison must demonstrate: "(1) direct infringement by a primary party, (2) a direct financial benefit to the defendant, and (3)the right and ability to supervise the infringers." MGM Studios, Inc. v. Grokster Ltd., 380 F.3d 1154, 1164 (9th Cir. 2004); A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1022 (9th Cir. 2001). It is clear that the first element is met because, as explained above, there is no genuine issue that the Beneses and Fremont Machine infringed Ellison's "Jungle Leaves" design.

1. Direct Financial Benefit

Waitt/Fremont licensed the rights to certain patents, including the '136 Patent, to Fremont Machine in exchange for royalties of 6% on Fremont Machine's sales. (Waitt/Fremont's Mot. re Ellison's First, Second, Third, and Seventh Claims for Relief [hereinafter Waitt/Fremont's Mot. re Copyright & Trademark Liability], p. 2.) Nevertheless, Waitt/Fremont alleges that it did not receive a financial benefit as a result of the direct

---

[9] CommCut and the Beneses are each liable for this infringement.

infringements of Ellison's designs because "Waitt/Fremont never received any royalties on sales of CommCut die-cutting machines." Id. (citing Tribulato Dep. at 36:10-19.)

At oral argument, however, Ellison argued that the Tribulato deposition transcript makes clear that Waitt/Fremont received royalty payments from the Beneses and Fremont Machine. The Court has reviewed the transcript and agrees that a triable issue remains as to whether Waitt/Fremont received a direct financial benefit from sales of the infringing machines. Summary judgment in favor of Waitt/Fremont nevertheless is appropriate because, as explained below, the Court finds that Waitt/Fremont did not have the right and ability to supervise the infringers.

2. Right and Ability to Supervise the Infringers

Waitt/Fremont does not contest that at the time of the direct infringement, Kelley Benes was a manager and part-owner of Waitt/Fremont as well as an owner of Fremont Machine. Ellison argues that "[i]nasmuch as its manager committed the infringing acts, Waitt/Fremont is liable for the infringement of its agent." Id. at 15 (citing Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 262 (9th Cir. 1996). Fonovisa, however, does not stand for the proposition that *respondeat superior* is the standard for proving the third element for vicarious copyright infringement. Even if that was the applicable standard, however, Waitt/Fremont would not be vicariously liable for Kelley Benes' infringement because she was not acting within the scope of her employment at Waitt/Fremont when the infringing activity occurred. Perez v. Van Groningen & Sons, 41 Cal. 3d 962, 967 (1986) ("Under the doctrine of respondeat superior, an employer is vicariously liable for his employee's torts committed within the scope of the employment.").

As the Ninth Circuit has explained, the third element focuses on the "relationship between the defendant and the direct infringer." Grokster, 380 F.3d at 1164. The oft-cited spectrum ranges from the "landlord cases" where no liability attaches, to the "dance hall cases" where it does. The distinction is based on the fact that "the dance hall operator has the right and ability to supervise the infringing conduct while the landlord does not." Id.

In Fonovisa, the court held that the third element was met because the infringing activity occurred in small booths within premises that the swap meet operator "owned and patrolled." Fonovisa, 76 F.3d at 262. Moreover, the swap meet operator could prevent further infringements because it had the right to terminate vendors for any reason whatsoever. Id.

Similarly, in A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001), the court found it probative that Napster could block infringers' access to its site for any reason whatsoever. Id. at 1023. The court noted, however, that the "boundaries of the premises that Napster 'controls and patrols' are limited"and distinguished the case from one where a trade

show operator reserved the right to police during the show and had its employees walk the aisles to ensure compliance. Id. at 1023-24. Ultimately, the court concluded that Napster should have patrolled its search indices and terminated infringing users' access. Id. at 1024.

Unlike the defendants in Fonovisa and Napster, however, Waitt/Fremont did not have the ability to control and patrol the actions of Fremont Machine or CommCut. (Waitt/Fremont's Reply re its Mot. on Copyright & Trademark Liability, pp. 8-9) In fact, Waitt/Fremont was a passive investor and never supervised the day-to-day activities of Fremont. (Id. citing Tribulato Depo. at 32:2-33:14, 38:22-40:9, 40:10-25.) Waitt/Fremont's role was analogous to the passive landlord who collected checks from his tenants, but was unaware of infringing activity and had no right to enter the infringer's premises.

The Court finds that no genuine issue remains whether Ellison can satisfy the third element required to hold Waitt/Fremont liable for vicarious copyright infringement. Therefore, the Court grants summary judgment in favor of Waitt/Fremont on this issue.

2. Trademark

Ellison also seeks to hold Waitt/Fremont vicariously liable for the Beneses' trademark infringement. (Opp'n to Waitt/Fremont's Mot. re Ellison's First, Second, Third, and Seventh Claims for Relief, p. 21.) Vicarious liability for trademark infringement, however, is narrower than vicarious liability for copyright infringement. Hard Rock Café Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1150 (7th Cir. 1992) (citing Sony Corp. of Amer. v. Universal City Studios, Inc., 464 U.S. 417, 439 n.19 (1984)); Symantec Corp. v. CD Micro, Inc., 286 F.Supp.2d 1265, 1275 (D.Or. 2003). The Court already has found that Waitt/Fremont is not liable for vicarious copyright infringement. Therefore, summary judgment is granted in favor of Waitt/Fremont on the issue of vicarious copyright infringement.

3. Trade Secret Misappropriation

Ellison also seeks to hold Waitt/Fremont liable for trade secret misappropriation based on confidential information that was disclosed to the Beneses and allegedly incorporated into the '136 Patent. (Opp'n to Waitt/Fremont's Mot. re Ellison's First, Second, Third, and Seventh Claims for Relief, p. 22.) Although Ellison recognizes that Waitt/Fremont "was not involved in the Beneses' initial act of [allegedly] improperly acquiring trade secrets," Ellison argues that "[i]nasmuch as Waitt/Fremont assumed prosecution of the patent application and later became the owner/licensor of the '136 Patent, there is no doubt that Waitt/Fremont 'used' the trade secret." (Id. at pp. 23-24.)

As explained above, however, the Court finds that a triable issue remains as to whether the Beneses incorporated Ellison's suggestions into the '136 Patent. Therefore,

viewing the evidence in the light most favorable to Ellison, the Court finds that a triable issue remains on the related issue of trade secret misappropriation. Waitt/Fremont's motion for summary judgment on this issue is thus denied.

4. Unfair Competition

Finally, Waitt/Fremont moves for summary judgment on Ellison's claim for unfair competition. Ellison's claim, however, is predicated on misappropriation of trade secrets, among other things. (Compl. ¶ 56.) Since a triable issue remains as to Waitt/Fremont's liability for misappropriation of trade secrets, its motion for summary judgment on the unfair competition claim is denied.

5. Conclusion

For the foregoing reasons, the Court grants Waitt/Fremont's motion for summary judgment on the issues of copyright and trademark infringement. Its motion is denied, however, on the issues of trade secret misappropriation and unfair competition.

4. Ellison's Motion for Summary Judgment on Quickutz's Declaratory Relief Cause of Action

In its Complaint in Intervention, Quickutz seeks a declaration that it is the sole owner of all rights, title or interest in the '136 Patent. Ellison's motion for summary judgment advances five reasons why Quickutz's claim should be denied. The Court addresses each argument in turn.

1. The Existence of an Enforceable Settlement Agreement

Ellison argues that it entered into an enforceable settlement agreement with Waitt/Fremont that precludes Waitt/Fremont from unilaterally assigning all interest in the '136 Patent to anyone. (Ellison's Mot. re Declaratory Relief, p. 10.) Ellison indicates in a footnote contained in its moving papers that the settlement agreement was written and that it is prepared to provide the Court with that agreement *in camera*. (Id. at n.3.) Absent evidence of that written agreement, however, the Court must decide the instant motion based on Ellison's contention that a valid, enforceable oral agreement was entered into between the parties.

Quickutz and Ellison agree that an oral settlement agreement may be binding. The parties dispute, however, whether such an agreement was entered into in this case. Ellison argues that the "agreement reached between Ellison and Waitt/Fremont which was communicated to this Court on April 19, 2004 was enforceable." (Id.)

The Ninth Circuit has explained that, "[i]n addition to the intent of the parties to bind themselves, the formation of a settlement contract requires agreement on its material terms." Callie v. Near, 829 F.2d 888, 890 (9th Cir. 1987) (emphasis in original). Ellison contends that a complete agreement existed on April 19, 2004, and "all that was needed were the signatures on the agreement document." (Ellison's Mot. re Declaratory Relief, p. 12.) This conclusory statement is not supported by any evidence and is challenged by Quickutz, which argues that the parties still were discussing a number of matters as of April 19, 2004. Indeed, the Court's Minute Order sent to the parties after the hearing reflects that the parties "are working on the final details of the agreement."[10]

Therefore, the Court finds that Ellison has failed to meet its Celotex burden of demonstrating a lack of genuine issue that the material terms of the settlement agreement were agreed upon as of April 19, 2004. Summary judgment on this ground is denied.

2. Evidence of Quickutz's Title

Next, Ellison claims that the assignment document that Quickutz filed with the United States Patent and Trademark Office is insufficient to prove Quickutz's title because it "contains a mere recital that for some unknown 'good and valuable' consideration the patent was transferred." (Ellison's Reply re Declaratory Relief, p. 1.) Ellison argues that the assignment document must demonstrate that Quickutz paid specific consideration for the patent. (Id.)

Ellison has not cited any case to support its argument. In re Roxford Foods Litigation, 1991 U.S. Dist. LEXIS 20590 (E.D.Cal. 1991) is an unpublished case that merely states "the recital of specific consideration in a contract is prima facie evidence that such was the consideration . . . ." Id. at * 10, n.3. This does not support Ellison's corollary assertion that the absence of specifically stated consideration somehow invalidates a contract. Similarly, Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A., 20 F.3d 987 (9th Cir. 1994) is inapposite. The issue in that case was whether the plaintiff violated the federal anti-collusion statute by assigning a claim from a parent company to its subsidiary in order to create diversity jurisdiction. The plaintiff argued that the assignment was not collusive because it was done for sufficiently compelling business reasons, as demonstrated by the fact that it received "good and valuable consideration" for the assignment. Id. at 992-93. The court merely held that the recital of "good and valuable consideration," without more, is insufficient to show a sufficiently compelling business reason in order to avoid the ambit of

[10]The Minute Order does not reflect, as Ellison suggests, that a contract was made. Therefore, Cal. Civ. Code § 1624(b)(3)(C) is inapplicable. Ellison is free to secure the transcript of the April 19, 2004 settlement conference to challenge this conclusion; however, it has failed to come forward with any contrary evidence in its motion.

the anti-collusive statute. Id. The unique facts of Nike have no bearing on the instant case and they certainly do not support Ellison's contention that specific consideration is required to assign a patent.

Therefore, the Court finds that Ellison has failed to meet its Celotex burden on this issue.

3. Validity of the Assignment Agreement

Ellison also argues that the agreements between the Beneses and Quickutz and Waitt/Fremont and Quickutz are illusory and violate public policy. (Ellison's Mot. re Declaratory Relief, pp. 15-17.) Ellison contends that Quickutz's obligations and considerations it paid for the '136 Patent are illusory because of a clause in the assignment agreement that returns the purchase price to Quickutz if Ellison establishes rights in the patent. In other words, if Ellison is found to be a joint inventor of the '136 Patent, Quickutz "gets its money back." (Ellison's Reply re Declaratory Relief, p. 4.)

To support its argument that the assignment agreement is illusory, Ellison cites to Ridge Runner Forestry v. Veneman, 287 F.3d 1058 (Fed. Cir. 2002). Veneman explained that an illusory promise is "words in promissory form that promise nothing; they do not purport to put any limitation on the freedom of the alleged promisor, but leave his future action subject to his own future will, just as it would have been had he said no words at all." Id. at 1061 (citing 1 CORBIN ON CONTRACTS § 145 (1963).) Here, Quickutz can not unilaterally decide to withdraw from the assignment agreement without good cause. Rather, Quickutz may be entitled to receive its purchase price back only if Ellison is adjudged to be a joint inventor of the patent. Quickutz's promise, therefore, is not illusory.

Moreover, Ellison argues that the assignment violates public policy because (1) allowing Waitt/Fremont to assign its rights after representing a settlement agreement to the court would frustrate the objective of encouraging settlement negotiations; and (2) the agreement provides that the Beneses will be paid in exchange for cooperating with Quickutz. (Ellison's Mot. re Declaratory Relief, pp. 16-17.)

The Court denies summary judgment on Ellison's first argument because, as explained above, it has not demonstrated a lack of triable issue as to whether the parties had agreed to the material terms of the settlement agreement as of April 19, 2004. If the material terms were not agreed upon, then no contract was formed and it does violate public policy for Waitt/Fremont to transfer its rights.[11]

---

[11]This, of course, assumes that the purported public policy exists. Ellison's harm would appear to be interference with contract or prospective advantage, theories nowhere advanced.

As to Ellison's second point, paragraph 4(h) of the consulting agreement between Quickutz and the Beneses states that, "The Beneses will, at QuicKutz's request and at QuicKutz's sole expense provide advice and assistance to QuicKutz in defending any Patent-Related Claims . . . . Such advice and assistance may include . . . providing testimony in legal proceedings." (Ellison's Reply re Declaratory Relief, p. 5.) This, according to Ellison, violates public policy because the Beneses are being compensated for their testimony in this lawsuit. (Id.) The Court is unpersuaded. The agreement between Quickutz and the Beneses is no different than an expert witness who is paid for his time.

The Court thus denies Ellison's motion for summary judgment on these issues.

4. Discovery Abuses / Unclean Hands

Finally, Ellison argues that "Quickutz's egregious abuse of the discovery process in this case warrant[s] a denial of its request for declaratory relief." (Ellison's Mot. re Declaratory Relief, p. 13.) The Court rejects this argument, however, because a summary judgment motion is not the proper manner for Ellison to seek relief. Discovery disputes are regulated by Fed. R. Civ. P. 37 and Local Rule 37 of this district. The formalities required by these rules have not been followed, and the Court refuses to allow Ellison to make an end-run around the requirements by seeking sanctions for discovery abuse in its motion for summary judgment.

Both Ninth Circuit cases that Ellison relies on–Von Poppenheim v. Portland Boxing & Wrestling Co., 442 F.2d 1047 (9th Cir. 1971) and Payne v. Exxon Corp., 121 F.3d 503 (9th Cir. 1997)–are inapposite because they involve dismissals after one party had disobeyed a court order. Here, Ellison has not sought a predicate order by this Court to compel discovery from Quickutz. The Court therefore denies Ellison's motion for summary judgment on this ground.

For the same reasons, the Court rejects Ellison's argument that Quickutz should be denied declaratory relief because it has unclean hands. To the extent Quickutz's unclean hands are caused by alleged discovery abuses, the Court reiterates its position that the proper remedy is a motion to compel or a motion for sanctions under Fed. R. Civ. P. 37. If Quickutz's hands are unclean because it allegedly interfered with an enforceable settlement agreement or disclosed confidential information, then Ellison's remedy is to initiate a separate action against Quickutz based on that interference or disclosure. In short, the Court is unwilling to deny Quickutz declaratory relief based on unclean hands because the remedy for Ellison's concerns are properly sought elsewhere, not in a motion for summary judgment.

4. CONCLUSION

For the foregoing reasons, the Court makes the following findings:

| Motion(s) | Issue | Court's Holding |
|---|---|---|
| Ellison's Motion for Summary Judgment for Patent Inventorship and Breach of Nondisclosure Agreements; Waitt/Fremont's Motion for Summary Judgment on Ellison's Fourth Claim for Relief; Quickutz's Motion for Summary Judgment on its Complaint in Intervention | Coinventorship of the '136 Patent | Denied as to all parties. |
| | Assignment of Rights | Granted in favor of Ellison |
| | Equitable Estoppel | Granted in favor of Ellison |
| | Breach of Nondisclosure Agreements | Denied as to all parties. |
| Ellison's Motion for Summary Judgment on Copyright and Trademark Liability | Copyright Infringement | Granted in favor of Ellison for "Jungle Leaves"; Granted in favor of CommCut and the Beneses for "Orange"; otherwise denied |
| | Trademark Infringement | Granted in favor of Ellison |
| | Trade Dress Infringement | Granted in favor of Ellison |
| | Willful Infringement | Denied |
| | Contempt of Consent Decree | Denied |
| Waitt/Fremont's Motion for Summary Judgment on Ellison's First, Second, Third, and Seventh Claims for Relief | Copyright Infringement | Granted in favor of Waitt/Fremont |
| | Trademark Infringement | Granted in favor of Waitt/Fremont |
| | Trade Secret Misappropriation | Denied |
| | Unfair Competition | Denied |
| Ellison's Motion for Summary Judgment on Quickutz's Declaratory Relief Cause of Action | | Denied on all grounds |